**In re Toni B. HAMPTON.**

**Toni B. Hampton, Plaintiff,**

v.

**Yam's Choice Plus Autos, Inc., Defendant.**

**Bankruptcy No. 4:02–BK–21578 E. Adversary No. 4:03–AP–1343.**

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

Jan. 10, 2005.

---

---

Jean Madden, for Plaintiff/Debtor.

Mark Riable, for Defendant.

Joyce Bradley Babin, for trustee.

## MEMORANDUM OPINION

AUDREY R. EVANS, Chief Judge.

Now before the Court is the Plaintiff's *Motion for Contempt,* an adversary proceeding seeking compensatory and punitive damages for violation of the automatic stay.[1] A trial was held on October 6, 2004, at which Jean Madden appeared on behalf of Plaintiff/Debtor, Toni B. Hampton (hereinafter "**Debtor**"), who was also present, and Mark Riable appeared on behalf of the Defendant, Yam's Choice Plus Autos, Inc. (hereinafter "**Defendant**"). At the close of evidence, the Court orally ruled that the Defendant had violated the automatic stay and would therefore be required to cure the violation by the end of the week. This Memorandum Opinion serves to clarify the Court's ruling that Defendant's conduct constitutes a violation of the automatic stay, and to rule on those issues the Court took under advisement: specifically, whether the Defendant's violation was willful such that compensatory damages are warranted under 11 U.S.C. § 362(h), and whether the circumstances of this case justify an award of punitive damages.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has jurisdiction to enter a final judgment in this case. The following constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION

This Adversary Proceeding involves a Debtor who purchased a vehicle on which a PayTeck security device (the "**PayTeck**") had been installed. The PayTeck operates to shut down the vehicle if a payment is missed and may also serve as an anti-theft device for both the customer and lienholder. It protects the lienholder by disabling the vehicle's starter if a certain code is not entered onto a keypad by a certain preprogrammed date. The lienholder retains the necessary monthly codes, and gives a new code to the debtor

---

1. Although Debtor's complaint is styled as a *Motion for Contempt,* the Court notes that the cause of action is actually for damages rather than contempt because a statute has been violated rather than a court order. *See James v. Bank (In re James),* 257 B.R. 673, 677–678 (8th Cir. BAP 2001).

only after receipt of each monthly payment. The Debtor asserts that she has been unable to rely upon the use of her car since she filed bankruptcy due to the PayTeck device, and that the Defendant's use of the PayTeck device on her vehicle constitutes a willful violation of the automatic stay. Specifically, Debtor claims that any code given to her to start the vehicle has not necessarily worked as long as it should, that her car fails to start at any given time and with no warning, and that Defendant has given her incorrect codes to start the vehicle on several occasions. The Defendant claims that any problems Debtor has had in using the PayTeck device are due to her misunderstanding regarding when to call for a new code, that perhaps Debtor does not fully understand how to properly use the PayTeck, and that if any incorrect codes were given to Debtor, it was an unintentional act by Defendant's employees.

## FACTS

Debtor filed for relief under Chapter 13 of the Bankruptcy Code on October 8, 2002. Her Chapter 13 plan was confirmed December 16, 2002. There is no dispute that Debtor has made her Chapter 13 payments on a regular basis. Debtor filed this adversary proceeding November 24, 2003.[2]

On June 28, 2002, Debtor purchased a 1988 Chrysler from Defendant. Debtor paid $300 down and financed the remainder of the purchase price by executing a Note and Security Agreement with Defendant. There is no dispute that Defendant has a perfected lien on the vehicle. The PayTeck was already installed on the vehicle at the time of purchase. Debtor testified that at the time of purchase, she only

understood the PayTeck to be an anti-theft device for her benefit. At that time, Debtor was given an instruction sheet explaining how to operate the PayTeck. Debtor explained that she first learned she would need a new code to start the vehicle each month when she made her first payment. The codes given to Debtor upon making her first and second payments in the months of July and August 2002, respectively, worked fine and she had no problems with her vehicle until after she filed bankruptcy. However, since filing bankruptcy, Debtor testified she was rarely able to start her car for more than two weeks without needing a new PayTeck code.

### How PayTeck is Supposed to Work

Defendant's finance manager, Terrence Conner, testified regarding how the PayTeck is supposed to work, and Defendant's procedures in giving their customers monthly codes to start their cars. The PayTeck is preprogrammed at the time of purchase to require a new code every 30 days; if the proper five-digit code is not entered by the shut-off date, the PayTeck will disable the vehicle's starter. Conner testified that the PayTeck cannot be remotely activated by Defendant or anyone else to disable a vehicle's starter—its operation is dependent solely on entry of a required preprogrammed code. Conner explained that the PayTeck is not programmed to disable the vehicle's starter on the payment due date itself (the "**due date**"), but rather seven to ten days later (on the "**shut-off date**") to allow the customer a grace period. However, Defendant recommends that customers always pay on the due date to ensure they get a new code in time. Conner explained that the customer obtains a new code each

---

**2.** Following the disposition of two pre-trial motions filed by the Plaintiff, the Court set the initial trial date in this case for August 19, 2004; the trial was then continued once until October 6, 2004.

month upon making the monthly payment. The customer may either mail the payment in and call for the code, or come into Defendant's place of business, make the required payment, and receive the new code. The Defendant keeps a list of pre-programmed codes for each vehicle with a PayTeck device in a notebook at its office. Certain employees are authorized to give out these codes once the required monthly payment has been made. Conner testified that Defendant currently has 21 customers with a PayTeck device (in addition to Debtor) who are in bankruptcy and those debtors are having no troubles with their PayTeck devices as far as he knew.

Conner further explained that the PayTeck allows a customer to check the number of days left before a new code is required, and also utilizes a warning system prior to disabling the vehicle's starter. At any time, the customer may type "CLR 3" into the PayTeck keypad, and the keypad will flash and beep the number of days until the payment is due. Conner also testified that when the PayTeck was getting ready to shut the car off, both the red light and green light on the PayTeck device would be on. Conner also explained that customers are provided with an emergency code (which is "CLR 911") so that they can start and run their car for a twenty-four hour period after it is shut off. Defendant introduced a PayTeck brochure with operating instructions which explains both the CLR 3 and CLR 911 features. Conner testified that it is the Defendant's regular procedure to give this brochure to each customer on whose car a PayTeck is installed and to go over the operating instructions with the customer to ensure that the customer understands how to operate the PayTeck.

Conner testified as to the procedure Defendant follows when a customer with a PayTeck files bankruptcy. Conner explained that a customer's attorney will first need to contact Defendant to verify that the customer has filed bankruptcy. Defendant's policy is to then give out the preprogrammed code each month when the customer calls in; in other words, the customer still needs to call in on the payment due date each month to get a new PayTeck code. With respect to the Debtor's PayTeck device, Defendant introduced a copy of a code sheet which listed each monthly code needed to start the vehicle (with future codes blacked out). Conner testified that the employee who gave out each monthly code initialed this sheet next to each monthly code. Conner also testified that human error is certainly possible, and that while an employee may have accidentally given Debtor an incorrect code on occasion, he had no knowledge of an intentional policy on Defendant's part to give Debtor incorrect codes. Conner explained that he believed the reason Debtor's codes were only lasting two weeks was because she did not call for a new code until after her car shut off, which could be almost two weeks past her payment due date (due to the built-in grace period). He explained that Debtor might then only have two good weeks with that code given that a new code would be needed at the next payment due date, approximately two weeks after she last obtained a code.[3] Conner testified that Defendant's employees would not

---

3. The Court notes that Conner's reasoning does not adequately explain why Debtor's codes only lasted approximately two weeks given his testimony that the PayTeck is pre-programmed to shut off on a particular day each month and that date is set to include a grace period of 7–10 days. The payment due date and the shut-off date are not the same date. Conner's theory appears to be based the Debtor needing a new code on the next due date, not the next shut-off date. However, the grace period could not simply disappear if the box were preprogrammed as Conner testified.

have told her to call for another new code in two weeks stating that they had no control over when a customer called for a new code—that customers should simply call on their payment due date for each new code.

### How PayTeck Worked for Debtor

On October 10, 2002, Jacqueline L'Heureux, an employee at the Madden Law Firm (Debtor's counsel), notified Defendant of Debtor's bankruptcy filing by fax and a follow-up phone call. On October 12, 2002, Debtor could not start her car. Debtor testified that she called to obtain a new code, explained that she was in bankruptcy, but was told that she was behind on her payments and would not be given a code. Debtor testified that she was ultimately given a bad code, and called back for a new one which then worked. Debtor also called L'Heureux on October 12 and complained that her counsel must not have informed Defendant of her bankruptcy; L'Heureux testified that she then called Defendant, and informed Defendant of the bankruptcy once again and tried to resolve the matter. L'Heaureux was told to have Debtor call for a new code, and she passed that information on to Debtor. Both Debtor and L'Heaureux testified that Defendant's employees made statements to the effect that Debtor was late on her payments and did not deserve the car. The next month, Debtor testified that she also had a problem starting her car and obtained a new code which only lasted two weeks. On January 8, 2003, Debtor testified she again had problems obtaining a code from Defendant, and that initially Defendant's employee refused to give her a code because she had not made her payment.[4]

L'Heaureux testified that Debtor called her again the latter part of March 2003 and complained that her car shut off every month, that she never knew when it would happen, that sometimes it was at the first of the month and sometimes at the end of the month. L'Heaureux testified that she called Defendant again, was transferred to a supervisor and told that Debtor was not making her payments. L'Heaureux testified that she explained that the Chapter 13 Trustee should be making the payments because Debtor was paying the Trustee, and the supervisor responded something to the effect of: "She does not deserve this car. And why does she think that she can just go off and do this to us?"

Debtor continued to have problems consistently starting her car and obtaining correct codes to start her car once it shut off. When Debtor filed this lawsuit, she signed an affidavit dated October 24, 2003, which stated, "Since [filing bankruptcy], I have been forced to call Yam's Choice Plus Auto every month about the 28th to get a code to restart my vehicle." However, Debtor testified that she has never been given a code that lasted for thirty days, and that most codes only lasted two or three weeks. When asked if she tried to estimate when her car would shut off, Debtor replied that she tried to estimate a date, and that although she had some trouble keeping up with that date due to her busy schedule, she basically could never determine when the car might not start. Debtor's son, Ralph Tucker, also testified that he sometimes drove the Debtor's car and was familiar with the PayTeck device, that he never knew when the car would not start, that it never consistently stopped on a particular day, that any given code never lasted more than 30 days, and

---

4. The Court assumes that despite Debtor's troubles in obtaining a correct code to start her vehicle, she was eventually able to obtain a correct code from Defendant since she testified that she could sometimes drive her car for up to two weeks at a time.

that he never saw a warning light before the PayTeck deactivated the vehicle's starter.

Debtor testified that she never saw a red light flashing or any sort of warning signal before the PayTeck deactivated her starter, and that she was never told about the emergency "CLR 911" code. Debtor testified that there would be a red light on whenever the starter was deactivated, and that once the proper code was entered, a green light came on. Debtor testified that the instruction sheet given to her was not the same as the brochure put into evidence by Defendant. Debtor testified that she tried changing the fuses in her car but her car problems did not improve. Debtor testified that Yam's never asked her to bring the vehicle in to have the PayTeck tested, and she did not bring it in on her own. At one point, Debtor was told by an employee of Defendant to reset the Pay-Teck by taking the cover off and inserting a pin into a small hole; she testified she followed these instructions, inserted a new code and did not have any additional problems starting the car for about three weeks.

Debtor testified that while she occasionally could call Defendant and get a good code that worked right away, she was often given an incorrect code and had to call back repeatedly to get the correct code. Debtor also testified that she was unable to get a code over the weekends or at night. Debtor believed that the Defendant's employees were giving her bad codes because once she was given the correct code, her car would start immediately. She felt that whoever gave her the codes did not know what they were doing because when she explained that she was in a chapter 13 bankruptcy, they continued to say she was behind on her car payment. Debtor testified that because she called Defendant so often, Defendant's employees knew her and which car she had bought whenever she called.

Due to Debtor's problems with the Pay-Teck device, she routinely needed transportation to and from work and to conduct personal business, and had to obtain such transportation from friends and relatives. Debtor has worked at the Pulaski County Juvenile Detention Center for three years. She used to work a 4:00 p.m. to 12:00 a.m. shift with Tuesdays and Wednesdays off and now works a 7:00 a.m. to 3:00 p.m. shift with Wednesdays and Thursdays off. Debtor testified that she never went to work without worrying that her car would not start when she was ready to leave. Debtor testified she was often late for work due to her car not starting, so she began to get up earlier to make sure her car would start, and if it did not (and she could not get a good code from Defendant), she tried to find a ride with either her colleague, Jennifer Roberson, her niece, Jackie Jackson, her nephew, Derrick Humbert, or her friend, Conrad Williams. Debtor paid these friends $5 for a ride to or from work. Debtor estimated that she was late for work approximately 60% of the time, but only by a few minutes each time and was docked approximately $26 in pay. Debtor also testified she paid approximately $25 every other week from the time she filed bankruptcy through the trial date for rides to work or to conduct personal business. Debtor testified that her supervisor at work talked to her about arriving to work on time, but she was never actually written up for tardiness.

Jackson, who lived with Debtor from December 2002 through August 2003, testified that she frequently gave Debtor rides to work or to run errands when Debtor's car would not start, especially on the weekends. Jackson estimated that Debtor could only drive to work 50–60% of the time. Jackson testified that Debtor

paid her $5 each way for a ride. Roberson, who has known Debtor for approximately two years, and worked the same shift as Debtor for a year and a half, also knew about Debtor's car troubles and Debtor's difficulty in getting to work on time. Roberson testified that Debtor normally arrived at work 10 to 15 minutes early, and that when Debtor was late, their supervisors would tease Debtor about her car. If they were working the same shift, Debtor would frequently call Roberson for a ride when her car would not start.

Debtor also testified about specific instances in which her car would not start because she had the wrong PayTeck code. She testified that about four or five times she was stranded at work after her shift. She testified that some of those times she was able to call Defendant and get a good code, and that other times, she had to call someone for a ride home. Once she was unable to take her car to church but paid a friend to take her, and another time, was unable to drive her car to a family Thanksgiving celebration in Marianna, Arkansas but found a ride with another relative. Debtor testified that she was also stranded at a gas station about 12:45 a.m. after ending her shift, and had to call Roberson to come and get her. Roberson also testified about this incident explaining that after she was already home for the evening, the Debtor called needing a ride. Because the gas station owner would not allow the car to remain in front of a pump, the Debtor and Roberson pushed it out of the way and left it at the gas station over night. Debtor also testified that she paid $127.15 to have her car towed after her niece was stranded at a store in North Little Rock. A receipt for this amount

from Phillips Brothers 24 Hour Towing Service was introduced into evidence.

Debtor testified that due to her problems with the car and the risk of being stranded in an unsafe place, her son obtained a cell phone for her in his name in October or November of 2002. Debtor testified that she paid all the cell phone bills, and introduced a cell phone receipt for $56.77 and testified that it was this amount every month. Debtor testified that she had no other need for a cell phone but that she did occasionally use it for other purposes.

Debtor's frustration ultimately led to her contact the Chapter 13 Trustee and inquire about obtaining more debt to purchase another car. She did not purchase another car however.

## LAW AND DISCUSSION

### A. *Willful Violation of the Automatic Stay*

Section 362(a)(3) of the Bankruptcy Code[5] provides, in part, that the filing of a bankruptcy petition operates as a stay of "any act ... to exercise control over property of the estate ....". Section 362(h) provides that individuals who are injured by a willful violation of the automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The party seeking damages for a stay violation must establish that: "(1) a violation occurred; (2) the violation was committed willfully, (3) the violation caused actual damages." *Rosengren v. GMAC Mortg. Corp.*, No. CIV. 00–971(DSD/JMM), 2001 WL 1149478, at *2 (D.Minn. Aug.7, 2001) (citing *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 628 (8th

---

5. All further references to code sections pertain to the Bankruptcy Code, Title 11, United States Code, unless otherwise noted.

Cir.1991) (further citations omitted)). "A willful violation of the automatic stay occurs when the creditor acts deliberately with knowledge of the bankruptcy petition." *Knaus v. Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir.1989) (citations omitted). *See also Fleet Mortgage Group, Inc. v. Kaneb (In re Kaneb)*, 196 F.3d 265, 269 (1st Cir.1999) ("A willful violation does not require a specific intent to violate the automatic stay. The standard for a willful violation of the automatic stay under § 362(h) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation."); *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir.1990) (same); *Cuffee v. Atlantic Bus. & Community Dev. Corp. (In re Atlantic Business & Community Corp.)*, 901 F.2d 325, 329 (3d Cir.1990) (same); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989) (same).

The Defendant installed a device on Debtor's vehicle which prevented her from using her car as she normally would. The Court finds the existence of the PayTeck on Debtor's car resulted in an overt exercise of control over estate property in violation of the automatic stay.[6] The unique question presented in this case is whether that violation was willful due to the creditor's failure to take the necessary action, such as removing the device or ensuring that Debtor always had a correct code to start her car. While this Court

could find no reported bankruptcy cases involving a PayTeck or similar device that disables a vehicle, there are many examples of creditors exercising control over estate property by failing to take appropriate action to ensure that they did not violate the automatic stay. For example, it is well-settled (at least within the Eighth Circuit) that a creditor who has repossessed (lawfully or otherwise) a debtor's vehicle is obligated to return that vehicle to the debtor upon receiving notice of debtor's bankruptcy. *See Williams v. GMAC (In re Williams)*, 316 B.R. 534, 541–542 (Bankr.E.D.Ark.2004) (relying on *Knaus*, 889 F.2d 773, and noting that some courts outside the Eighth Circuit have declined to follow *Knaus* for various reasons). *See also In re Davis*, 265 B.R. 453, 457 (Bankr.N.D.Fla.2001) (citing *In re Brooks*, 207 B.R. 738 (Bankr.N.D.Fla. 1997)). Further, courts have held that a creditor who allows a pre-petition garnishment to go forward despite notice of a bankrupting filing violates the automatic stay. *See O'Neal v. Beneficial of Tennessee (In re O'Neal)*, 165 B.R. 859, 862 (Bankr.M.D.Tenn.1994) (and cases cited therein). The *O'Neal* court determined that like pre-petition garnishments, the post-petition receipt of an automatic draft loan payment also violates the automatic stay. *Id.* at 863. In *O'Neal*, the court stated:

> Creditors should have the burden and responsibility of ensuring that no post-petition automatic loan payments are withdrawn from a debtor's checking ac-

---

**6.** Although the parties do not dispute that the Debtor's vehicle is property of her bankruptcy estate, the Court notes that pursuant to §§ 1306 and 541, property of the estate includes all property in which the Debtor had a legal or equitable interest, such as the Debtor's vehicle. Despite the automatic revesting of estate property in the Debtor upon confirmation of her plan under § 1327(b), the Debt-

or's plan specifically provides that property of the estate continues to be property of the estate until the Debtor receives a discharge or her case is closed or dismissed. *See* § 1322(b)(9) (providing that a plan may provide for the vesting of estate property in the debtor or another entity upon the plan's confirmation or at a later time).

count, absent the debtor's clear, post-petition consent to do so. *The creditor should take whatever action is necessary and appropriate to achieve this goal. Failure to do so will lead to the imposition of sanctions in the form of the debtor's actual damages, including attorneys' fees and costs.* *Id.* (Emphasis added). Likewise, in *Flynn v. Internal Revenue Service (In re Flynn),* the Bankruptcy Court for the Southern District of Georgia found that the Internal Revenue Service willfully violated the automatic stay by sending a notice of levy to a debtor's employer after receiving notice of the debtor's bankruptcy filing. 169 B.R. 1007, 1014 (1994) (*aff'd in part, rev'd in part,* 185 B.R. 89 (S.D.Ga.1995) (affirming bankruptcy court's finding that IRS willfully violated the automatic stay and award of actual damages, including those for emotional distress, but reversing bankruptcy court's award of punitive damages against the IRS due to a change in the law prohibiting awards of punitive damages against the government for violation of the automatic stay)). In *Flynn,* the court noted that the IRS corrected its violation of the automatic stay only after its collection activity had begun and it had been contacted by the debtor. *Id.* at 1011–1012. The *Flynn* court found that the IRS' failure to have a system in place that ensured bankrupt taxpayers were not levied against despite a bankruptcy filing to be particularly egregious. *Id.* at 1024.

Just as in the cases described herein, the Defendant's failure to take appropriate action to avoid violating the automatic stay leads the Court to find that Defendant willfully exercised control over estate property by requiring the Debtor to call Defendant every month for a code to start her car. Defendant's assertion that it did not willfully violate the stay because it had no policy to give Debtor incorrect PayTeck codes, and that any incorrect codes given to Debtor were the result of an accident or oversight, is not only meritless, but irrelevant. It is the fact that Defendant placed the burden on Debtor to obtain a code in the first place that violates the automatic stay. Once Debtor filed bankruptcy, Debtor should have been free to use her vehicle without interference by Defendant (unless the creditor sought and obtained court approval to do so). However, because the Defendant had placed a PayTeck device on her vehicle, it already had in place a mechanism for exercising control over Debtor's property. Defendant then placed the duty on Debtor to obtain the appropriate code to start her vehicle. By placing that burden on the Debtor, rather than taking action itself, Defendant willfully violated the automatic stay.

Although the Court has found that Defendant's inaction results in a willful violation of the automatic stay regardless of any system it had in place to provide debtors in bankruptcy with the proper PayTeck code upon their request, the Court further finds that in this case, the Defendant's system did not in fact work as the Defendant claimed it should. This finding is important to this case because had the system worked as it should, and had Debtor called in every month on the payment due date and obtained a valid code to run her car for 30 days, as Defendant alleges she should and could have, and if Debtor had in fact been able to use her car with no interruption by the PayTeck device, the Defendant may have violated the automatic stay, but Debtor would have incurred no actual damages as a result.

The Debtor's testimony, which the Court found credible, demonstrated that she was unable to consistently use her car, that she called for codes more than once a month and was frequently given incorrect codes. The fact that she was unable to start her

car on a regular basis, and could not anticipate in advance when her car would shut off, was corroborated by other witnesses' testimony. Moreover, given that the Debtor called Defendant so frequently that its employees knew, without further reference or information, who she was and which car she had purchased, the Defendant should have been alerted to a possible malfunction with the PayTeck installed on Debtor's vehicle. Yet, Defendant took no action to stop its continuing violation of the stay. Defendant's employees never suggested that Debtor come in and have her PayTeck inspected or tested which demonstrates that Defendant was not really invested in enforcing its alleged system to provide this Debtor with the correct PayTeck codes so that she could use her car. Finally, both Debtor and L'Heaureaux testified that Defendant's employees, on more than one occasion, made statements to the effect that Debtor should not receive a code because she had not made payments and did not deserve the car. This leads the Court to believe that the Defendant did not adequately ensure that its employees would not violate the stay by harassing a debtor in bankruptcy—they should have known better, but they did not. In other words, the Defendant's policy of providing debtors in bankruptcy with the correct code promptly upon their request was either not communicated to its employees or was not enforced, at least with respect to this Debtor.

In sum, although the Defendant claimed it had a policy regarding customers who had filed bankruptcy that enabled these customers to drive their cars without interruption (apart from calling Defendant for the proper monthly code), this policy was either not communicated to all its employees, not enforced, or simply did not work as it should have in Debtor's case. If the latter is true, Defendant took no action to correct that problem although it was aware of it, not only through Debtor's frequent phone calls, but the fact that this lawsuit was filed almost a year before it came to trial. It is the failure of Defendant's alleged policy or system that caused Debtor to be unable to rely upon the use of her car and incur actual damages, and as a consequence, Defendant is responsible for the damages incurred by the Debtor.

### B. Compensatory Damages

■ The Debtor must present evidence to prove she suffered actual damages. *See Lovett v. Honeywell, Inc.*, 930 F.2d 625, 629 (8th Cir.1991); *United States v. Ketelsen (In re Ketelsen)*, 880 F.2d 990, 992 (8th Cir.1989). In this case, Debtor testified to the following out-of-pocket expenses incurred by her as a result of the PayTeck shutting off her car:

- $26 docked from pay;
- $25 every other week for two years (from the time she filed bankruptcy on October 8, 2002, until the date of trial, October 4, 2004) to pay for rides from friends and relatives, for a total of $1,300;
- $121.15 to have her car towed when it shut down at a store in North Little Rock and had to be moved; and
- $56.77 per month for a cell phone she obtained in October or November of 2002 only due to the potential danger caused by the irregular shut down of her vehicle; at 23 months (November 2002 through October 2004, the date of trial and removal of the PayTeck device), this totals $1,305.71,

for a total of $2,752.86 in actual damages. The Court found Debtor to be an extremely credible witness. Additionally, Debtor's testimony was largely corroborated by the testimony of other witnesses, including those who gave her rides, her colleague who also testified as to her often being late

for work even though she was habitually early for work prior to her car troubles, and L'Heaureax who testified about her own attempts to resolve the Debtor's problems by contacting Defendant directly. Debtor introduced the receipt for having her car towed, and also introduced a receipt for her cell phone bill testifying that she paid for this in approximately the same amount each month. The Court is not troubled by the Debtor's failure to keep detailed records of each time her car would not start forcing her to find rides with friends and relatives and the total amount expended on such rides; instead, the Court believes that because Debtor's motive was always to get to work, that keeping detailed records for the purpose of damages was not her goal, and thus, was not done. Finally, a review of Debtor's testimony leads the Court to conclude that her damages were minimized by vigilance in making alternative arrangements to get to work, and were not at all exaggerated for the purpose of compensation.

For these reasons, the Court finds that Debtor has sufficiently proven that she suffered at least $2,752.86 in actual damages as a result of Defendant's willful violation of the automatic stay. Additionally, in accordance with § 362(h), the Court finds that it is appropriate to award Debtor her attorney fees and costs in bringing this action, and will determine the Debtor's reasonable attorneys' fees and costs following the filing of an affidavit by Ms. Madden in accordance with an Order entered in accordance with this opinion.

### C. Punitive Damages

■ With respect to punitive damages, § 362(h) provides that a willful violation of the automatic stay alone is not enough to warrant punitive damages; there must also be a finding of "appropriate circumstances." *Knaus*, 889 F.2d at 776. "Appropriate circumstances" warranting punitive damages require " 'egregious, intentional misconduct on the violator's part.' " *Id.* (citing *United States v. Ketelsen (In re Ketelsen)*, 880 F.2d 990, 993 (8th Cir.1989)).

■ The Court finds that punitive damages are not warranted in this case. Although the Defendant's pattern of disregard for the Debtor's problems with the PayTeck could lead to a finding of intentional misconduct, the Defendant produced evidence that was sufficient to prove that it did not intend to violate the automatic stay. On behalf of the Defendant, Conner testified that Defendant currently had 22 total customers with a PayTeck device who were in bankruptcy, and other than Debtor, none of these customers were having troubles with their PayTeck devices as far as he knew. Accordingly, Defendant had reason to believe that it was conducting itself properly. While this is not a defense to a willful violation of the stay, it is a defense to an allegation of egregious, intentional misconduct.

### CONCLUSION

The PayTeck device installed by Defendant interfered with the Debtor's normal use of her car because Defendant failed to meet its obligation to negate the effect of the device on the Debtor's car. The Defendant's inaction resulted in a willful violation of the automatic stay, and it became liable for the compensatory damages Debtor suffered as a result of the violation. However, insufficient evidence of intentional, egregious conduct on the Defendant's part precludes an award of punitive damages in this case.

The Court is not holding that the existence of the PayTeck alone violates the automatic stay; rather, it is the Defendant's inaction in making sure that Debtor had use of her car while in bankruptcy

that caused the automatic stay to be violated. The Defendant could have avoided this violation by taking action to ensure that Debtor had the correct code to operate her car each month, such as by mailing the correct code to Debtor each month. If the PayTeck was faulty, which seems to be likely in this case, the Defendant should have taken immediate action to fix the PayTeck and ensure that Debtor could use her car. The existence of a PayTeck on a vehicle does not per se warrant damages; however, in this case, the PayTeck did in fact interfere with the Debtor's use of her car causing her to suffer actual damages. Defendant is therefore liable to Debtor for those damages. In sum, creditors who have installed PayTeck or similar devices on debtors' vehicles bear the burden of ensuring that such devices do not deprive debtors the use of their vehicles; once a customer with such a device files bankruptcy, and notifies the lienholder of such bankruptcy, the lienholder must take action to ensure that a security device like the PayTeck does not deprive a debtor the use of his or her vehicle.

An Order in accordance with this Memorandum Opinion will be entered this date. A Final Judgment will be entered once the amount of Debtor's attorney's fees and costs has been determined.